NOV 20 2024 PM 1:29
FILED-USDC-CT-HARTFORD

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT    3:24MJ1046 (TOF)

| | | |
|---|---|---|
| STATE OF CONNECTICUT | : | ss: Hartford, Connecticut |
| | : | |
| | : | November 20, 2024 |
| COUNTY OF HARTFORD | : | |

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH AND SEIZURE
WARRANT

I, Matthew Bok, a Task Force Officer with the Drug Enforcement Administration, having been duly sworn, state:

## INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of applications under Rule 41 of the Federal Rules of Criminal Procedure for search warrants authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B to the search warrants.

2.    I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18 of the United States Code.  I am a Detective with the Fairfield (CT) Police Department, whom I have been employed by since 2017.  From July 2023 to the present, I have been assigned as a deputized Task Force Officer ("TFO") to the Drug Enforcement Administration ("DEA") New Haven District Office ("NHDO") Tactical Diversion Squad ("TDS"), which is comprised of personnel from the DEA, Bristol (CT) Police Department, West Haven (CT) Police Department, Hamden (CT) Police Department, Seymour (CT) Police Department, and Connecticut State Police.  During my tenure as a Police Officer and a DEA Task

Force Officer, I have participated in criminal investigations, including investigations into suspected drug trafficking, and related offenses.

3.    I have received instruction in conducting such investigations while attending the Connecticut Police Academy (POSTC) in Meriden, Connecticut, the Fairfield County Detectives Conference Detective School in Westport, Connecticut, DEA Task Force Officer School in Stafford, Virginia as well as various other schools, seminars, and periodic in-service training.

4.    Over the past six years in law enforcement, I have participated in investigations involving individuals suspected of distributing illegal drugs and individuals diverting pharmaceutical controlled substances, and have assisted in controlled purchases of illegal drugs/diverted substances using cooperating witnesses, confidential sources and undercover officers. I have assisted state and federal prosecutors in preparing affidavits in support of applications for search warrants and arrest warrants, and have obtained and coordinated the execution of such warrants. These investigations have resulted in the seizure of illegally diverted pharmaceuticals, illegal drugs, illegally possessed firearms, United States currency, assets acquired with drug proceeds, and assets used to facilitate drug activities, as well as led to the arrest and/or conviction of many of those involved. I have conducted electronic as well as physical surveillance of individuals involved in drug diversion and illegal drug distribution, analyzed records documenting the purchase and sale of illegal drugs, and spoken with informants and subjects, as well as other local, state and federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs or participate in the diversion of pharmaceutical controlled substances. As a result of my training and experience, I am familiar with behaviors, methods and common practices of persons

2

and organizations that illegally import, manufacture, divert and distribute controlled substances, as well as the devices commonly used by them.

5.    As part of my duties, I am currently participating in an investigation into violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute, and distribution of, controlled substances) and 21 U.S.C. § 846 (conspiracy to distribute controlled substances) (hereinafter the "TARGET OFFENSES") by Evelyn JIMENEZ-KOVALEV and Angel BENITEZ.

6.    As explained more fully below, the investigation has revealed that the aforementioned individuals are co-conspirators involved in the diversion of pharmaceutical controlled substances, operating in the greater Hartford area.

7.    The information set forth in this affidavit comes from my personal observations and my own investigative efforts, my training and experience, and information obtained from other law enforcement officers acting in their official capacity, who have reported their findings to me. I have personally participated in this investigation and am familiar with the facts and circumstances of the offenses. The statements contained in this affidavit are based, in part, on my personal knowledge.  Where the contents of documents, or communications with others are reported in this affidavit, they are set forth in substance and part, unless otherwise indicated.  This affidavit does not purport to set forth all of the facts gathered during the course of the investigation of this matter, but rather includes only those facts which are necessary to establish probable cause to support the issuance of the requested criminal complaints and requested search warrant.

I.    **IDENTIFICATION OF THE DEVICES TO BE EXAMINED**

8.    I make this affidavit in support of search warrants for multiple cellular phones, collectively the "TARGET DEVICES[1]". The TARGET DEVICES are further described as follows:

a. The property to be searched is an Android smartphone in a red case, assigned call number (860-776-7156), hereinafter "TARGET TELEPHONE 1." TARGET TELEPHONE 1 is owned and utilized by Evelyn JIMENEZ-KOVALEV, and is currently stored at the DEA New Haven Office evidence vault. Investigators identified the phone number though a reliable Source of Information (SOI) and through communication between a DEA Confidential Source (CS) and JIMENEZ-KOVALEV via that telephone number. Additionally, service provider subpoenas for that phone number confirmed it is subscribed to Evelyn KOVALEV.

b. The property to be searched is a blue iPhone smartphone with no case, with a background lock screen of a face with red eyes, suspected to be assigned call number (959-258-9523), hereinafter "TARGET TELEPHONE 2." TARGET TELEPHONE 2 is owned and utilized by Angel BENITEZ, and is currently stored at the DEA New Haven Office evidence vault. Investigators identified the phone number during analysis of toll records from TARGET TELEPHONE 1. Additionally, JIMENEZ-KOVALEV provided a DEA

---

[1] These cell phones were seized as evidence during the arrest of the defendants on a federal complaint and arrest warrant. The cell phones were seized during the execution of a federal authorized search warrant for a residence. The phones were both used to arrange the sale of controlled substances as outlined in the warrant. The phones were seized during the execution of a warrant on the same date that both individuals were arrested and brought to Court. Before being presented in federal court on November 6, 2024, Angel Benitez was taken to the hospital and held overnight by the agents involved in the investigation – thus delaying their ability to sleep and presented him to the Court the next date November 7, 2024 (after being medically cleared). Law enforcement then had to process and inventory the items recovered in the residence (including the target phones). The agents involved in the investigation had to process all of the evidence, assist in writing this cell phone warrant, and prepare for and quickly present the case to the federal grand jury. During this two week time frame there were two weekends and a federal holiday in which the Court's were closed. Additionally, the affiant, the lead investigator was in charge of Police Department mandatory training for two days during this time frame.  None of the individuals that utilized these telephones have sought to have their telephone returned to them since their arrest.

CS with TARGET TELEPHONE 2's phone number as a point of contact for suspected future drug purchases. Service provider subpoenas for that phone number confirmed it is subscribed to an "Ange Benz", a street name for Angel BENITEZ as identified by investigators.

9.      The applied-for warrants would authorize the forensic examination of the TARGET DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B to the search warrants.

## II.    **BACKGROUND**

10.     Between June, 2024 and present, members of the Drug Enforcement Administration (DEA) Tactical Diversion Squad (TDS) investigated the diversion and illicit redistribution and sale of prescription opioids in the greater Hartford area. The investigation identified Evelyn JIMENEZ-KOVALEV and Angel BENITEZ as parties involved in the diversion operation. Further, the investigation involved analysis of phone and toll records, physical surveillance of JIMENEZ-KOVALEV and BENITEZ, as well as the use of a DEA Confidential Source (CS) to conduct a number of controlled phone calls and subsequently complete three controlled purchases of Oxycodone pills from JIMENEZ-KOVALEV and BENITEZ. This investigation found both JIMENEZ-KOVALEV and BENITEZ to be intimately involved in the illegal diversion and distribution of prescription opioids, as during this investigation, both JIMENEZ-KOVALEV and BENITEZ participated in the negotiation of pill price and availability via telephone prior to controlled purchase operations and both were observed participating in controlled purchases.

### III.    PROBABLE CAUSE

*Initial Intelligence Regarding JIMENEZ-KOVALEV*

11.     During the month of June, 2024, DEA Task Force Officer (TFO) Scott Verillo contacted a Source of Information (SOI) who was aware of information regarding multiple individuals involved in the diversion and illicit sale of prescription pain medication operating in the greater Hartford area. The SOI was known to the Bristol Police Department and had previously provided information to law enforcement that had proven to be accurate and reliable.

12.     The SOI stated he/she was aware of an individual selling their prescription Oxycodone pills. The SOI relayed that the individual goes by the alias "Tweety," and is a Hispanic female in her late 30's and she resides with her boyfriend at 194 Washington Street in Hartford Connecticut. The SOI relayed that "Tweety's" real name may be "Evelyn Covalett" or something similar. The SOI further relayed that "Tweety" receives a large prescription for "blues" (a commonly used term to describe blue Oxycodone 30mg pills) approximately every 20 days which she sells for $40 - $50 each pill. The SOI also relayed that "Tweety" fills her prescription at the Walgreens Pharmacy in East Hartford, CT. The SOI also provided "Tweety's" phone number as 860-776-7156. The SOI noted that "Tweety's" boyfriend may have a firearm in the apartment and may be involved or aware of the sale of the prescription medication.

13.     Through investigative measures, TFO Verillo and I identified "Tweety" as Evelyn JIMENEZ-KOVALEV, of 194 Washington Street, Apt 412, Hartford, CT. A check of Prescription Monitoring Program (PMP) records showed that JIMENEZ-KOVALEV receives a recurring prescription for approximately 240 oxycodone 30 mg pills every 20 days, and that the filling pharmacy is Walgreens located at 20 Connecticut Boulevard, East Hartford, CT. PMP records

6

showed a consistent and routine filling of JIMENEZ-KOVALEV's prescription on the scheduled fill date since the beginning of August 2023.

*Phone Record Information*

14.    Phone record subpoenas on the phone number (860-776-7156) provided by the SOI for JIMENEZ-KOVALEV, listed the subscriber for 860-776-7156 as Evelyn Kovalev. The address listed on the billing information was listed as 184 Washington Street Hartford CT, 06106-2463.

15.    Additional review of JIMENEZ-KOVALEV's phone records identified phone number 959-258-9523 as a top/frequent caller of JIMENEZ-KOVALEV. Phone record subpoenas for 959-258-9523 returned the subscriber information for that number as an "Ange Benz" with no further information.

*Open Source Social Media Profiles*

16.    A check of open source social media platforms was conducted and a Facebook profile was located under the profile name "Evelyn Kovalev" the profile images were of JIMENEZ-KOVALEV "Tweety". A second Facebook profile for JIMENEZ-KOVALEV was located under the profile name of "Eva Ange Espinosa". That profile contained a number of images of JIMENEZ-KOVALEV. Several of the images included JIMENEZ-KOVALEV with a Hispanic male with dark hair and a goatee. Additionally, the profile listed a relationship status as engaged to an "Ange Benz".

17.    The Facebook profile under the name "Ange Benz" depicted a number of photographs of a Hispanic male with dark hair and a goatee. Additionally, there were several images of that Hispanic male posing with JIMENEZ-KOVALEV.

*Surveillance of JIMENEZ-KOVALEV prescription refill on August 1, 2024*

18.     On 08/01/2024 at approximately 9:00 AM, NHDO TDS investigators conducted surveillance in the area of Walgreens, 20 Connecticut Boulevard, East Hartford CT, with the purpose of observing JIMENEZ-KOVALEV fill her prescription for Oxycodone at the Walgreens Pharmacy.

19.     During the course of the surveillance, I observed a grey Honda Accord enter and park within the Walgreens parking lot and observed that the vehicle was operated by an older white male and had a female passenger. I observed that the female fit JIMENEZ-KOVALEV's physical description/DMV demographic information. Upon the female exiting the vehicle, I observed that the female appeared to be JIMENEZ-KOVALEV and based upon the comparison of the observed female to JIMENEZ-KOVALEV's ID photo and open-source social media photographs, I identified the female as JIMENEZ-KOVALEV. I then observed JIMENEZ-KOVALEV enter the Walgreens.

20.     TFO Verillo and TFO Jamie Boisvert followed JIMENEZ-KOVALEV into the pharmacy however JIMENEZ-KOVALEV went out of sight, in the pharmacy area of the Walgreens. TFO Verillo and I later observed JIMENEZ-KOVALEV exit the Walgreens/pharmacy and enter the Honda Accord while carrying a small paper bag consistent with those provided at the pharmacy to hold prescription medications. TFO Verillo then observed JIMENEZ-KOVALEV manipulating what appeared to be a prescription bottle in an action consistent with her ingesting a pill.

21.     The Honda was followed by investigators from Walgreens to 194 Washington Street, Hartford, CT. Upon the Honda's arrival, I observed JIMENEZ-KOVALEV exit the vehicle and walk to and enter the front entrance for 194 Washington Street.

8

22.    During further surveillance on 08/01/2024, investigators observed JIMENEZ-KOVALEV exit the front entrance of 194 Washington Street a number of times while appearing to be talking or texting on a cellular phone. On two occasions, investigators observed JIMENEZ-KOVALEV walk to and enter the Walgreens located at 161 Washington Street, Hartford, across the street from JIMENEZ-KOVALEV's residence.

23.    On both occasions which JIMENEZ-KOVALEV was observed going to Walgreens, investigators observed her conducting transactions which appeared to be consistent with JIMENEZ-KOVALEV loading several hundred dollars in cash onto prepaid cards. It is believed these transactions are the result of pill sales conducted out of sight within JIMENEZ-KOVALEV's apartment, after which the drug proceeds were loaded onto the prepaid cards.

24.    Toll records for JIMENEZ-KOVALEV (TARGET TELEPHONE 1) showed a significant increase in communication volume on or around the date of the prescription refill (August 1, 2024 and August 2, 2024) when compared to other dates in that timeframe. Additionally, toll records showed JIMENEZ-KOVALEV to be in communication with "Ange Benz" (TARGET TELEPHONE 2) after filling her prescription, and around the time that investigators observed JIMENEZ-KOVALEV on her phone and believed JIMENEZ-KOVALEV to be conducting pill sales in or around 194 Washington Street.

*Controlled Purchase protocol*

25.    During the course of this investigation, investigators solicited the cooperation of a DEA Confidential Source, hereinafter referred to as the "CS,"[2] to conduct controlled purchases of illegal drugs from the JIMENEZ-KOVALEV during the months of August and September, 2024.

---

[2] The CS began cooperating with law enforcement in approximately April 2005. The CS has provided information which has been corroborated and proven to be reliable, has led to the acquisition of illegal drugs during controlled purchase operations similar to those described herein, and led to the arrests of some of those involved. The CS is cooperating with law enforcement for monetary compensation.

9

In each instance, law enforcement would meet the CS at a predetermined location and search them and their vehicle (when applicable) for contraband and/or excess money. Finding none, the CS would then be equipped with covert recording and/or transmitting device(s), to ensure the CS's safety and/or to memorialize the controlled purchase operation. The CS would then be provided with an amount of recorded police buy money with which to complete the controlled purchase. The CS would then travel directly to a predetermined controlled purchase meet location, while under constant law enforcement surveillance and making no stops along the way, where they would meet with JIMENEZ-KOVALEV and complete the controlled purchase. After, the CS would travel directly back to the predetermined location while under constant law enforcement surveillance and making no stops along the way. There, the CS would provide the purchased illegal drugs acquired during the operation to law enforcement and the covert recording/transmitting device(s) would be removed. The CS would then be searched again for contraband and/or excess money. Finding none, the CS would be debriefed by investigators related to the details of the controlled purchase operation. These protocols were followed in all of the following controlled purchases.

*Controlled Purchase #1*

26.     On August 7, 2024, members of NHDO TDS utilized the DEA CS to conduct a controlled purchase of 30 mg Oxycodone pills from Evelyn JIMENEZ-KOVALEV and a male who would be identified as Angel BENITEZ in Hartford, CT. The controlled purchase operation followed the previously mentioned controlled purchase protocol and was initiated by the CS contacting JIMENEZ-KOVALEV via her phone (TARGET TELEPHONE 1) while investigators listened in on the call. During that phone call the CS negotiated the purchase of $350.00 worth of Oxycodone pills from JIMENEZ-KOVALEV.

27.     During law enforcement surveillance of the controlled purchase investigators observed JIMENEZ-KOVALEV and a Hispanic male (BENITEZ) exit the front entrance of 194 Washington Street and walk to the adjacent gas station parking lot where the two met with the CS and conducted the controlled purchase. Officers then observed JIMENEZ-KOVALEV and the Hispanic male (BENITEZ) entered 194 Washington Street. They entered apartment 412, which JIMENEZ-KOVALEV unlocked and both JIMENEZ-KOVALEV and the Hispanic male (BENITEZ) entered. Based on the surveillance it was concluded that the drug proceeds from the controlled purchase were taken back into apartment 412 by either JIMENEZ-KOVALEV or BENITEZ.

28.     The CS provided the nine Oxycodone 30 mg pills to the officers that CS purchased during the controlled purchase.

*Identification of Angel BENITEZ*

29.     Investigators obtained a Connecticut Identification card for an Angel BENITEZ (DOB known to investigators) and confirmed that the Hispanic male seen with JIMENEZ-KOVALEV on August 7, 2024 was Angel BENITEZ. Further, BENITEZ was the same person in the images on the social media page profiles for "ANGE BENZ" and "Eva Ange Espinosa."

30.     As explained earlier, the CS was introduced to the male Hispanic (identified by investigators) during the controlled purchase. TFO Verillo and I showed the CS an image of Angel BENITEZ and the CS identified Angel BENITEZ as the male who had been with JIMENEZ-KOVALEV. The CS stated that JIMENEZ-KOVALEV had handed the CS the pills from her hand and that JIMENEZ-KOVALEV had taken the cash from the CS. Further, the CS explained that it appeared JIMENEZ-KOVALEV passed the money to BENITEZ. The CS stated to investigators

11

that during the controlled purchase JIMENEZ-KOVALEV told the CS that "her pills are legitimate, and she gets them from Walgreens."

31.     The pills seized as a result of controlled purchase were submitted for laboratory analysis. The result of the laboratory testing identified Oxycodone as the only identified controlled substance contained within the seized pills.

32.     Review of toll records confirmed TARGET TELEPHONE 1 to be in communication with TARGET TELEPHONE 2 on 08/07/2024.

*Controlled Phone Calls with JIMENEZ-KOVALEV prior to Controlled Purchase #2*

33.     On August 16, 2024 the CS conducted a controlled call to JIMENEZ-KOVALEV (TARGET TELEPHONE 1) to inquire about another purchase of Oxycodone pills. The call was recorded. During the call JIMENEZ-KOVALEV and the CS negotiated the purchase of Oxycodone pills for $1760.00 and JIMENEZ-KOVALEV informed the CS that she would be refilling her prescription on Wednesday (August 21, 2024) from the Walgreens in East Hartford. JIMENEZ-KOVALEV stated to the CS that she takes her prescription home after refilling and counts them before setting some aside and bagging them. JIMENEZ-KOVALEV also stated she was concerned about selling in the area of the pharmacy because there may be police in the area, and it would look suspicious.

34.     On August 20, 2024 the CS contacted JIMENEZ-KOVALEV via phone (TARGET TELEPHONE 1) to purchase more Oxycodone pills. During the conversation JIMENEZ-KOVALEV told the CS that tomorrow (August 21, 2024) she would be able to sell more pills. JIMENEZ-KOVALEV said she would contact the CS tomorrow after she filled the prescription and that it would be around 10:00 or 11:00 AM.

*Controlled Purchase Operation #2*

12

35.    On August 21, 2024 members of NHDO TDS conducted a controlled purchase of 30 mg Oxycodone pills from Evelyn JIMENEZ-KOVALEV in Manchester CT. As noted, the controlled purchase operation followed the previously mentioned controlled purchase protocol.

36.    At approximately 10:05 AM, in the presence of investigators, the CS contacted JIMENEZ-KOVALEV via her telephone (TARGET TELEPHONE 1). The phone call was recorded. At that time, JIMENEZ-KOVALEV told the CS that she had just gotten back from picking up her prescription and was ready to meet with the CS. The CS and JIMENEZ-KOVALEV negotiated price and quantity for the purchase. During their conversation JIMENEZ-KOVALEV put her phone on speaker and a male voice joined the conversation and began negotiating the price for the pills with the CS. The CS would later say that he/she recognized the male voice as belonging to the Hispanic male who had accompanied JIMENEZ-KOVALEV during the controlled purchase on August 7, 2024. The male identified as Angel BENITEZ.

37.    JIMENEZ-KOVALEV and BENITEZ agreed to find a ride and meet the CS to conduct the sale of 40 Oxycodone pills for $1,760.00.

38.    Investigators maintained constant surveillance on JIMENEZ-KOVALEV as she left her residence and travelled to the agreed upon meeting location via an unknown third party. Investigators observed JIMENEZ-KOVALEV arrive at the meeting location and enter the CS vehicle and conduct the controlled purchase. Investigators then surveilled JIMENEZ-KOVALEV from the controlled purchase back to her residence, 194 Washington Street. Upon arriving at 194 Washington Street, TFO Boisvert observed JIMENEZ-KOVALEV enter her apartment, 194 Washington Street APT 412. Based on the surveillance prior to and following the controlled purchase, investigators concluded that JIMENEZ-KOVALEV left her residence where the controlled substances are believed to be stored and travelled directly to the controlled purchase

location with the controlled substances and then went immediately home to her residence with the drug proceeds.

39.    The CS provided approximately forty (40) Oxycodone 30 mg pills that the CS purchased from JIMENEZ-KOVALEV.

40.    The CS stated that the CS contacted JIMENEZ-KOVALEV to purchase oxycodone pills. JIMENEZ-KOVALEV told the CS that she had picked up her prescription and was ready to meet the CS. CS further stated, that JIMENEZ-KOVALEV asked the CS how many pills CS wanted and that while negotiating the price, JIMENEZ-KOVALEV stated something to the effect of "I'm not the one who controls this shit" and then put the phone on speaker and that a male voice began negotiating the price along with JIMENEZ-KOVALEV. The CS told the investigators that the CS recognized the voice as belonging to Angel BENITEZ, the same male who was with JIMENEZ-KOVALEV and introduced as her husband at the purchase on August 7, 2024.

41.    The CS further stated to investigators that during the controlled purchase, JIMENEZ-KOVALEV entered the CS vehicle and took a small plastic bag out of her pants which contained a quantity of round blue pills which she gave to the CS and that the CS gave JIMENEZ-KOVALEV the $1760.00 of buy money.

*Toll Records Surrounding Controlled Purchase #2*

42.    Toll records for JIMENEZ-KOVALEV (TARGET TELEPHONE 1) showed a significant increase in communication volume on or around the date of the controlled purchase operation, the same date as JIMENEZ-KOVALEV's prescription refill (08/21/2024) when compared to other dates in that timeframe. Additionally, toll records showed JIMENEZ-KOVALEV to be in frequent communication with BENITEZ (TARGET TELEPHONE 2) around the time she filled her prescription, as well as prior to and immediately following the controlled

purchase operation on August 21, 2024.

43.    The pills purchased on August 21, 2024 were submitted for laboratory analysis. The result of the laboratory testing identified Oxycodone as the only identified controlled substance contained within the seized pills.

*Controlled Call Prior To Controlled Purchase #3*

44.    On September 9, 2024 at the direction of investigators, the CS conducted a recorded control call to JIMENEZ-KOVALEV (TARGET TELEPHONE 1) to inquire about another purchase of Oxycodone pills. During the conversation between the CS and JIMENEZ-KOVALEV, the CS inquired as to the availability of the Oxycodone pills for purchase and their price. JIMENEZ-KOVALEV relayed to the CS that she was refilling her prescription the following day (September 10, 2024) at 10:00 AM but was having difficulty figuring out a ride to the pharmacy in East Hartford. During the conversation, JIMENEZ-KOVALEV began negotiating the price with the CS, however JIMENEZ-KOVALEV was then joined by the same male voice which the CS recognized as belonging to Angel BENITEZ. The CS asked JIMENEZ-KOVALEV if the voice belonged to her man which she confirmed. The following sections of conversation are a transcription of relevant parts of the phone conversation:

**CS**: I got 2500 if you can give me 75 for it.

**CS**: That's your man on the phone there, right?

**JIMENEZ-KOVALEV**: Yea.

**JIMENEZ-KOVALEV**: Aye he said 75 and we can do 75 to what? For how much?

**CS**: 2500.

**BENITEZ**: (Unintelligible).

**JIMENEZ-KOVALEV**: (Unintelligible in Spanish) Talk to him, he deals, he, he is the

one who deals with that.

**CS**: Alright let me chat with him then.

**CS**: Yea. So yea, so I just told Tweety right um I need 75 and get them for the 2500 because you know I'm going to buy it off of you all the time. And I showed you my good faith, you know?

**BENITEZ**: That's like we sellin the pills for less than 34 dollars.

**CS**: So, so what's the most, what's the most you can do for me?

**BENITEZ**: I know last time I said you can come, like you can come through and fuck around and do 38 and you keep coming and then we can talk from there, you keep on coming.

**CS**: How much I get for 38 there? I don't gotta calculator on me right now.

**BENITEZ**: I know you said you out there in New York and have money. I know you getting them shit, selling them shit for like 50-55 dollars because I know people.

**BENITEZ**: I'm like I had a few mother fuckers that were from out that way and shit, New Jersey and Bridgeport and all that and they buy them from you 50-55 dollars.

**CS**: But how much is that? How much is that uh the 38? How much pills is that?

**BENITEZ**: Well you trying to get 75?

**CS**: Yea if I can get 75 for 2500 but you're saying that's 33. Let me see something. You got...

**BENITEZ**: If was to give you 20, um, 75 for 38 that would be 2850.

**BENITEZ**: Hold up.

**BENITEZ**: 68 would be 2508.

**CS**: 68 would be 2508. Um 68. You can't do 70 for me for the 25 this time?

**BENITEZ**: Hold up.

**BENITEZ**: How about 60, no I mean 65, yea 65, 65, that'll be 2470 for 65 of them.

**CS**: So, you can't just give me like 68 for the 2500 this time and then next time you already know, because I even gave her the money I owed you last time, you know what I mean I ain't trying to.

**JIMENEZ-KOVALEV**: Yea he did.

**BENITEZ**: He said 68 for 25?

**CS**: Yea if you do the 68 for me for 25 and then I do a bigger number with you the next time too.

**BENITEZ**: 68 for 25? Yea that'll be 20, that'll be 68 2584, yea we can do that.

**CS**: You already know I'm good for that, man and um...

**BENITEZ**: Wait what like listen because I know what you be doing too, be like when we, when we sell you a certain amount, the leftovers that we like, if we wanna sell a little more, we sell them for 40-45 to people, you know like, we sell like 2 or 3 here and there, so we be poppin off that too, like selling them for more

**CS**: Yea but remember you're getting a bulk cash that's right away off the bat to start your, to start your move off if you know.

**BENITEZ**: Remember I told you last time we had a couple of people that was buying a lot too, but like they was trying to low ball to the max and I was like man we aint, we don't need enough, but we ain't crack heads either so like ya'll (racial slur) know you're fucking making a profit more than need shit like some of the (racial slur) fucking trying to actually make like 30-40 dollar profit off this shit.

**BENITEZ**: 65 right?

17

**CS**: Yea so you said you'd give me 68 for the 2500.

**JIMENEZ-KOVALEV**: 58?

**CS**: No, 68.

**JIMENEZ-KOVALEV**: Hold up, 2500?

**BENITEZ**: Yea 68 straight I say 2584, so yea we can do that do 84 dollars less than.

On the call, JIMENEZ-KOVALEV and Angel BENITEZ ultimately agreed to sell sixty-eight Oxycodone pills to the CS on September 10, 2024 for $2500.00.

*Controlled Purchase #3*

45.    On September 10, 2024 members of NHDO TDS conducted a controlled purchase of 30 mg Oxycodone pills from JIMENEZ-KOVALEV in East Hartford, CT. As noted earlier, the controlled purchase operation followed the controlled purchase protocol.

46.    At approximately 9:30 AM, the CS was contacted by JIMENEZ-KOVALEV via her telephone (TARGET TELEPHONE 1). This call occurred in the presence of investigators. Over the course of multiple phone calls JIMENEZ-KOVALEV informed the CS that she had obtained a ride to the pharmacy to pick up her prescription and would meet the CS at the pharmacy to conduct the sale of the pills. Investigators later observed JIMENEZ-KOVALEV enter and exit the Walgreens pharmacy and conduct the controlled purchase inside of the CS vehicle. Investigators continued to surveil JIMENZ-KOVALEV after the controlled purchase and followed her directly to her residence. Investigators observed JIMENEZ-KOVALEV enter 194 Washington Street Apt. 412. Based on the surveillance investigators concluded that JIMENEZ-KOVALEV

took the controlled purchase proceeds as well as the remaining Oxycodone pills with her into apartment 412.

47.    During the controlled purchase, the CS purchased approximately sixty-eight (68) Oxycodone 30 mg pills.

48.    The CS stated to investigators that during the controlled purchase JIMENEZ-KOVALEV was on the phone with a male who the CS stated was JIMENEZ-KOVALEV's "husband" giving her instructions. The CS explained that during the controlled purchase, JIMENEZ-KOVALEV was carrying the pills in a prescription container and that she was dispensing them from the container. CS stated that JIMENEZ-KOVALEV counted them out to complete the sale and then handed them to the CS.

49.    The pills seized as a result of controlled purchase were submitted for laboratory analysis. The result of the laboratory testing identified Oxycodone as the only identified controlled substance contained within the seized pills.

*Toll Records Surrounding Controlled Purchase #3*

50.    Toll records for JIMENEZ-KOVALEV (TARGET TELEPHONE 1) showed a significant increase in communication volume on or around the date of the controlled purchase operation, the same date as JIMENEZ-KOVALEV prescription refill (September 10, 2024) when compared to other dates in that timeframe. Additionally, toll records showed JIMENEZ-KOVALEV to be in communication with BENITEZ (TARGET TELEPHONE 2) prior to filling her prescription, as well as prior to and following the controlled purchase operation on September 10, 2024. The toll records did not show a record of JIMENEZ-KOVALEV (TARGET TELEPHONE 1) in contact with BENITEZ (TARGET TELEPHONE 2) at the approximate time of the controlled purchase and it is unknown if JIMENEZ-KOVALEV was utilizing a different

voice communication application other than cellular or a different phone which utilizes a number unknown to investigators. Recorded video from the controlled purchase operation captures JIMENEZ-KOVALEV appearing to talk on the phone when meeting with the CS.

*Controlled Phone Calls with JIMENEZ-KOVALEV on September 29,2024*

51.    On 09/29/2024, at the request of investigators the CS conducted a recorded control call to JIMENEZ-KOVALEV via TARGET TELEPHONE 1, during which JIMENEZ-KOVALEV explained that she would be refilling her prescription the next day. During the call JIMENEZ-KOVALEV was joined by BENITEZ and both JIMENEZ-KOVALEV and BENITEZ agreed to hold pills from the next refill for the CS to purchase. During the call, the CS also requested the BENITEZ contact the CS from his (BENITEZ's) phone number for the purpose of future transactions and business.

52. The following day, 09/30/2024, JIMENEZ-KOVALEV provided BENITEZ's phone number (959-258-9523) to the CS via text message.

*Surveillance of JIMENEZ-KOVALEV prescription refill on September 30, 2024*

53.    On 09/30/2024 at approximately 9:00 AM, NHDO TDS investigators conducted surveillance in the area of Walgreens, 20 Connecticut Boulevard, East Hartford CT, with the purpose of observing JIMENEZ-KOVALEV fill her prescription for Oxycodone at the Walgreens Pharmacy.

54.    At approximately 10:15 AM, TFO Boisvert observed a red Jeep SUV enter the Walgreens parking lot and pull into the line for the drive-thru pharmacy. Investigators recognized the red Jeep as a vehicle JIMENEZ-KOVALEV had travelled in during previous surveillances. TFO Boisvert observed that the passenger of the red Jeep was JIMENEZ-KOVALEV and TFO Boisvert further observed JIMENEZ-KOVALEV interacting with the staff at the pharmacy drive-

thru window. JIMENEZ-KOVALEV would subsequently leave the area as a passenger in the Jeep and the vehicle was followed until it arrived and parked at JIMENEZ-KOVALEV's residence, 194 Washington Street, Hartford. At that time, I observed JIMENEZ-KOVALEV exit the Jeep and enter 194 Washington Street while carrying a bag consistent with those provided by pharmacies to carry prescription medications.

55.     TFO Boisvert was positioned inside of the apartment building near JIMENEZ-KOVALEV's apartment (apartment 412), and approximately a minute after JIMENEZ-KOVALEV was observed entering the building, TFO Boisvert heard a female voice in conversation get off the elevators and stop in the area of JIMENEZ-KOVALEV's apartment. TFO Boisvert then obtained a visual on JIMENEZ-KOVALEV's apartment, but the door had just been shut. TFO Boisvert then checked the immediate area and did not see JIMENEZ-KOVALEV. Based on these observations it is believed JIMENEZ-KOVALEV entered her apartment.

56.     A review of PMP records confirmed that JIMENEZ-KOVALEV refilled her prescription for Oxycodone on 09/30/2024 at the Walgreens located at 20 Connecticut Boulevard, East Hartford, Connecticut, which is consistent with the activity observed by investigators during the surveillance operation conducted on that same date.

57.     Toll records for JIMENEZ-KOVALEV (TARGET TELEPHONE 1) showed a significant increase in communication volume on or around the date of JIMENEZ-KOVALEV's prescription refill on September 30, 2024 when compared to other dates in that timeframe. Additionally, toll records showed JIMENEZ-KOVALEV (TARGET TELEPHONE 1) to be in communication with BENITEZ (TARGET TELEPHONE 2) minutes after filling her prescription,

*Phone Communication Between October 3, 2024 and October 20,2024*

58.     Between the dates of 10/03/2024 and 10/20/2024 JIMENEZ-KOVALEV (TARGET TELEPHONE #1) and BENITEZ (TARGET TELEPHONE 2) attempted to contact the CS numerous times via text and/or phone calls and were contacting the CS for the suspected purpose of completing a drug transaction. In particular, during this time period, JIMENEZ-KOVALEV sent the CS several text messages asking if the CS was still interested in the pills being held and later informed the CS that they (JIMENEZ-KOVALEV and BENITEZ) will have to sell the pills to someone else since they had not heard from the CS. During this time, the CS also received several text messages from BENITEZ (TARGET TELEPHONE #2) inquiring as to the whereabouts of the CS and if he was still willing to engage in future transactions.

*Surveillance of JIMENEZ-KOVALEV prescription refill on October 20, 2024*

59.     On 10/20/2024 at approximately 9:45 AM, NHDO TDS investigators conducted surveillance in the area of Walgreens, 20 Connecticut Boulevard, East Hartford CT, with the purpose of observing JIMENEZ-KOVALEV fill her prescription for Oxycodone at the Walgreens Pharmacy.

60.     At approximately 10:00 AM TFO Boisvert and I observed a red Honda Civic park within the parking lot of the Walgreens and I observed JIMENEZ-KOVALEV exit the passenger's position of the Honda and enter the Walgreens. Approximately 30 minutes later, I observed JIMENEZ-KOVALEV exit Walgreens carrying various items, one of which was a small white bag consistent with those provided by pharmacies to hold prescription medications. I observed JIMENEZ-KOVALEV enter the Honda with the white bag and begin talking with the Honda's unknown Hispanic female operator. For several minutes JIMENEZ-KOVALEV and the unknown female appeared to be engaged in conversation. During that time, I observed JIMENEZ-KOVALEV and the unknown female manipulating the white bag and a bottle shaped item that

22

appeared had come out of the bag. At that same time, I observed JIMENEZ-KOVALEV manipulating her phone in a manner that appeared consistent with texting or taking a picture of the white bag/bottle.

61.    JIMENEZ-KOVALEV and the Honda were followed from Walgreens back to the area of JIMENEZ-KOVALEV's residence, 194 Washington Street, Hartford Connecticut. At that same approximate time, I observed JIMENEZ-KOVALEV exit the Honda while carrying the white bag and walk to and enter the front entrance to her apartment building, 194 Washington Street. Several minutes later, TFO Boisvert would observed JIMENEZ-KOVALEV enter her apartment (Apartment 412).

62.    A review of PMP records confirmed that JIMENEZ-KOVALEV refilled her prescription for Oxycodone on 10/20/2024 at the Walgreens located at 20 Connecticut Boulevard, East Hartford, Connecticut, which is consistent with the activity observed by investigators during the surveillance operation conducted on that same date.

*CS Controlled Call October 21, 2024*

63.    On October 21, 2024 the CS reported to investigators that he/she had been contacted by JIMENEZ-KOVALEV via TARGET TELEPHONE 1 and BENITEZ via TARGET TELEPHONE 2. On that same date, at the direction of investigators, the CS conducted a recorded controlled phone call to JIMENEZ-KOVALEV via TARGET TELEPHONE 1, to discuss the purchase of Oxycodone. During the phone conversation JIMENEZ-KOVALEV relayed to the CS that she had to sell the pills from her last prescription refill which she had been saving for the CS, after she had not heard from the CS. JIMENEZ-KOVALEV further relayed that if the CS becomes available she will have more pills to sell and that she gets her next refill on the eighth (October 8th). Below are relevant sections of the controlled phone call transcription:

23

**JIMENEZ-KOVALEV:** Man I almost got evicted! I had to freaking give (Unintelligible) to somebody else.

**CS:** Oh, shit. What, what, what happened?

**JIMENEZ-KOVALEV:** I almost got evicted. Cause I was waiting for you. You told me that you were going to call me on Wednesday, and you never did. And then you said that you were going to be back on Wednesday, um after Wednesday. (Unintelligible) And I'm waiting for you because I was running late on my rent. And all of a sudden you were nowhere to be found.

**CS:** Yeah, so you, you collected more stuff or you got rid of everything?

**JIMENEZ-KOVALEV:** No, I got rid of the things I had to get rid of because I was, we was waiting for you. Even my man text you and everything. We was waiting for you but, you know how many times we, I called you?

**CS:** No, but that's the thing, you see that the thing I'm calling you. (Voices Overlap)

**JIMENEZ-KOVALEV:** (Unintelligible) Me and my husband we was talking about like you got locked up or something. (voices overlap)

**CS:** Yeah, shit. You collect more stuff? or that was the same stuff you had?

**JIMENEZ-KOVALEV:** No, that was, we was, that was the same thing. and then like, and then like that happened, like you, you disappeared. Like, my man, I had my man call you, I had my man text you, because you said like for my man to give you his number

**CS:** So, so when are you going to get back again?

**JIMENEZ-KOVALEV:** Alright um, are you, are you back for good?

**CS:** No, I didn't come back yet, that what I'm telling, that why I grabbed this phone.

**JIMENEZ-KOVALEV:** Oh (voices overlap), When, when are you coming back?

**CS:** I'm looking to come back less than ten days maybe. To be exact.

**JIMENEZ-KOVALEV:** Oh okay, so you going to be, if you going to be back in less than 10 days, I get them again, I get them again, I get them again on the eighth.

**CS:** On the eighth, um, uh okay that yeah that should be enough time, I should definitely be back before then. Alright so hold it down. If anything, text me on this number. Don't call on this number just text me, cause I can't pick up, I'm going to have to pay, to pay. But I'll link you as soon as I come back, I'll let you know that I'm back in town.

**JIMENEZ-KOVALEV:** Alright

**CS:** Alright, tell your man I said what's up man.

**JIMENEZ-KOVALEV:** Alright, I will, I will let him know.

64.     In a text message following the phone conversation with JIMENEZ-KOVALEV, the CS asked if the CS sent a third party to JIMENEZ-KOVALEV, would she sell any Oxycodone to the CS through the third party however JIMENEZ-KOVALEV declined.

65.     In my training and experience, individuals engaged in the illegal sale of controlled substances are weary of new customers and will often decline the involvement of unknown parties as to avoid the risk of law enforcement cooperators/investigators.

*Execution of Federal Search Warrants and Arrest Warrants on November 11, 2024*

66.     On October 30, 2024 the Honorable Robert A. Richardson, United States Magistrate Judge for the District of Connecticut, authorized Search and Seizure Warrants for 194 Washington Street, Apt. 412, Hartford, CT ("TARGET LOCATION). In addition, Criminal Complaints and Arrest Warrants were issued for Evelyn JIMENEZ-KOVALEV and Angel BENITEZ.

67.    On November 06, 2024 at 6:00 AM, a coordinated execution of the Search and Seizure and Arrest Warrants was conducted by investigators. At that time, Evelyn JIMENEZ-KOVALEV and Angel BENITEZ were placed under arrest. A systematic search of the TARGET LOCATION was also conducted, yielding items of evidentiary value (the following list may not include every item seized; rather, it specifies those items with relevance to the warrants requested herein):

    a. Seized from TARGET LOCATION

        i. Approximately 3 suspected counterfeit blue Oxycodone Pills imprinted "M 30"

        ii. Smith and Wesson semi-automatic handgun (reported stolen December 2017)

        iii. Notebook/suspected drug ledger

        iv. TARGET TELEPHONE #1[3]

        v. TARGET TELEPHONE #2[4]

68.    It should be noted that on scene JIMENEZ-KOVALEV described and identified TARGET TELEPHONE 1 as her phone. On scene BENITEZ described and identified his phone as TARGET TELEPHONE 2. In a post Miranda interview with BENITEZ, he described his phone to be a blue iPhone with no case and a lock screen of an artistic depiction of a face with red eyes and fangs. BENITEZ stated that his phone had been located on top of the safe next to his bed. BENITEZ further explained that phone was his primary phone and while he did not remember the full telephone number, it starts with 959. BENITEZ also included that the phone service was currently deactivated due to an issue with the phone bill. All of the information provided by

---

[3] Upon seizure of TARGET TELEPHONE 1, TFO Bok called the number 860-776-7156 to confirm it to be Evelyn JIMENEZ-KOVALEV's cellphone.

[4] Upon seizure of TARGET TELEPHONE 2, TFO Bok called the number 959-258-9523 however the number appeared to no longer be in service and no phones in the apartment rang. A later review of toll records for TARGET TELEPHONE 2 would confirm a record of TFO Bok's call to TARGET TELEPHONE 2.

BENITEZ was consistent with the characteristics and seizure of TARGET TELEPHONE 2 and investigators knowledge of the telephone in use by BENITEZ assigned call number 959-258-9523.

69.     Several other electronic devices were located on scene however all appeared to be older and either out of battery or non-functional and located in places consistent with their inactive use. Based on these facts and circumstances, it is reasonable to believe that the cellular phones seized (TARGET TELEPHONES 1 and 2) are the primary devices used by JIMENEZ-KOVALEV and BENITEZ, and therefore will contain communication records and historical data relevant to this investigation.

## IV.     GENERAL ANALYSIS OF PHONE USE BETWEEN TARGET TELEPHONE 1, TARGET TELEPHONE 2

70.     Review of toll records showed TARGET TELEPHONE 1 and TARGET TELEPHONE 2 to be each other's top callers with 1,584 communications between May 25, 2024 to October 30, 2024.

71.     Based on the facts and circumstances described herein, investigators believe that Evelyn JIMENEZ-KOVALEV and Angel BENITEZ use telephones to stay in contact in furtherance of criminal activities. Specifically, they use **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2** to set up and schedule prescription refills, communicate regarding the refill/drug resupplies, and the sale of drugs to street level customers or redistributors. Accordingly, there is probable cause to believe, and I do believe, that evidence of the TARGET OFFENSES will be found on the **TARGET DEVICES**.

## V.     GENERAL INFORMATION ABOUT DRUG DIVERSION INVESTIGATIONS

27

72.   . The diversion of pharmaceutical/prescription controlled substances involves the unauthorized or unregulated taking, transferring or dispensing of certain medications/chemicals classified under the controlled substances act, away from their legitimate and regulated path from creation or synthesis to their final destination of legitimate patients or research entities.

73.   Many problems associated with drug abuse are the result of legitimately made controlled substances being diverted from their lawful purpose into illicit drug traffic. The mission of DEA's Diversion Control Division is to prevent, detect, and investigate the diversion of controlled pharmaceuticals and listed chemicals from legitimate sources while ensuring an adequate and uninterrupted supply for legitimate medical, commercial, and scientific needs.

74.   Drug diversion can occur at many points in the legitimate flow of pharmaceutical controlled substance from a laboratory to patient and may include physical theft at any point in the process, unnecessary or over prescription by doctors, fraudulent or counterfeit prescription filling, or the sale of a persons' own legitimately prescribed medications to another party.

75.   Most often the more potent and more strongly controlled/scheduled controlled substances have a higher demand by illegitimate purchasers or users and have a significantly higher level of demand and sale price at the street level as well as an increased potential for abuse by consumers. The most common diverted pharmaceuticals include opiates, including Oxycodone, and amphetamines, which both have high levels of abuse across the United States and are in part responsible for the increasing Opioid epidemic.

76.   Based on my experience investigating these types of diversion related crimes, I am aware that the customers of diverted pharmaceuticals are often individuals unable to obtain a prescription themselves who seek the controlled substances for the purposes of abuse, or individuals seeking to purchase the substances in bulk for the purpose of drug trafficking and bulk

or street level resale. In either situation the legitimate holder of the prescription will sell part or all of their prescription to a customer for cash and in many cases will communicate and deal with the same customers on a repeat and regular basis due to the repeat and regular nature of prescriptions and their regular schedule of refill. Often customers and dealers will communicate via telephone on or around the date of a refill pickup to arrange the sale/purchase of the controlled substances.

77.    Cases such as those explained above involving individuals selling their own prescription controlled substances pose a number of difficulties for investigators and differ from traditional drug trafficking investigations in a number of ways. A main challenged faced by investigators is the fact that the possession of the prescribed controlled substance by the prescription holder is not a violation and said person can possess, store, and transport said controlled substance without caution or risk of arrest. In these cases, enforcement can often only occur after the sale of the medication, and once the buyer takes possession. Diversion investigations differ further in that a set refill schedule and set quantity of the controlled substance prescription dictates when a patient can refill/reup their available inventory for sale and how much they have available. These limitations relegate sellers and buyers to an often predictable and routine schedule which is essentially reset each prescription refill on a regular basis. In my experience from diversion investigations I am aware that prescription holders/sellers will communicate with customers prior to their prescription fill date and arrange the sale of the prescription medications in advance. Prescription holders will further ensure that they fill their prescription as soon as possible and then conduct the arranged sales after refilling the prescription. In my experience, prescription holders/sellers will seldom deviate from their set pattern of operation (filling, storing, transporting, selling of medications) and will follow a predictable pattern which renews each date of prescription refill.

## VI.    GENERAL INFORMATION ABOUT PRESCRIPTION DRUG DIVERSION

78.    During my tenure as a law enforcement officer, I have investigated and participated in operations which involved, in part, drug trafficking violations and the illegal diversion of pharmaceutical/prescription controlled substances, as well as the flow of the illegal proceeds obtained from prescription drug diversion, drug trafficking and related offenses. Search warrants relating to these investigations have covered, among other locations, residences, vehicles, businesses, stash locations, distribution locations used by drug traffickers and their coconspirators, and cellular or electronic devices utilized for communication, record keeping, or data storage.

79.    Materials searched for and recovered in these locations have included, among other evidence, the following: controlled substances; drug paraphernalia, such as scales, processing materials and packaging materials; cellular devices used for the communication and arrangement of drug sales; electronic devices utilized for data storage, financial asset management, and security equipment; books and records reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed for drugs, and the names, addresses and telephone numbers of coconspirators; sales receipts and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; currency and money wrappers; cryptocurrency, cryptocurrency wallets or their constitutive parts, whether in electronic or physical format, to include "recovery seeds" or "root keys" which may be used to regenerate a wallet; records of bank transactions made to conceal and launder drug trafficking proceeds; and various valuable assets such as real property and automobiles that were purchased with the proceeds of unlawful drug trafficking. These items obtained during the executions of said search warrants have constituted evidence of drug violations, the acquisitions of assets with drug trafficking proceeds, and the use of the assets to facilitate drug trafficking violations.

30

80.     Based on my training, experience and participation in this and other drug trafficking investigations, I know that:

a.      Drug traffickers often use multiple cellular telephones to facilitate drug deals and based on surveillance and telephone toll analysis described above, law enforcement believes that JIMENEZ-KOVALEV and BENITEZ may hold two or more phones simultaneously and utilize some or all of those phones for the purposes of narcotics related activity and the furtherance of their criminal activity.

b.      Drug traffickers maintain in their electronic devices, digital books, records, receipts, diaries, ledgers, calendars, personal telephone/address data, airline tickets, airline schedules and airline receipts, and other digital data relating to the transportation, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances that have been distributed; these materials are often maintained within the electronic memory of cellular devices, personal computers, iPads or other computerized tablets, external hard drives, memory cards, and thumb drives .

c.      Drug traffickers commonly provide narcotics on consignment sale to their customers, who subsequently pay for the drugs after reselling the drugs. Therefore, the above mentioned digital books, computerized records, receipts, notes, ledgers, etc., will be secured by the drug traffickers within their residences and/or their electronic devices for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs.

d.      Drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone numbers of drug associates within their residences and/or electronic devices, for ready access and to conceal them from law enforcement agencies.

31

e.      Drug traffickers commonly maintain digital/electronic records reflecting names, nicknames, addresses, and telephone numbers of both their current and past drug associates.

f.      Drug traffickers who are aware of an ongoing criminal investigation will often destroy an existing format of records reflecting their drug transactions. However, it is common for drug traffickers, particularly traffickers who provide or receive drugs on a consignment basis, to create another type of drug record to assist the trafficker in the collection of drug debts.

g.      Drug traffickers commonly use their residence and/or electronic devices to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets.

h.      Drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate and business fronts.

i.      Persons involved in drug trafficking who are aware of a criminal Investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets.

j.      Drug traffickers often have photographs, digital electronic data, or video movies of themselves, their co-conspirators and the property and assets purchased with drug proceeds. These photographs and video movies are normally in the drug traffickers' possession or residence or contained within their electronic devices in a digital format.

32

81.    In addition, there is probable cause to believe that TARGET TELEPHONE 1 and TARGET TELEPHONE 2 contains evidence of the target crimes, including documents, records, or other evidence regarding, among other things, the following: financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from engaging in drug diversion activities; electronically stored contents, which reflect names, addresses, telephone numbers of and text messages to or from their associates and/or clients in diversion activity; photographs and digital recordings of participants and associates in narcotics trafficking activity and of property acquired as a consequence of narcotics trafficking activities; location data related to locations travelled to meet end level consumers and/or bulk purchasers as well as other diversion related associates; electronic receipts, transactions records, and other documents relating to the transfer of money from their customers and/or other coconspirators; and electronic records relating to the rent and use of storage locker units, safety deposit boxes, or other property used to facilitate their illegal activities.

## VII.    GENERAL INFORMATION CONCERNING THE USE OF CELLULAR TELEPHONES IN FURTHERANCE OF DRUG TRAFFICKING AND DIVERSION

82.    Based on my training and experience, I know that individuals involved in the illegal diversion of controlled substances and/or the trafficking of illicit narcotics (narcotics traffickers) often use cellular telephones, and often speak to one another using coded, cryptic or slang words and phrases, in the belief that, by doing so, they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs and/or assets. I know, based upon my training and experience, that narcotics traffickers and distributors often segregate various aspects of their illicit business, and use different telephones when tending to each of the various aspects,

in an effort to thwart law enforcement and insulate themselves and their confederates. For example, drug dealers often use one telephone to contact customers and another to contact their narcotic source(s) of supply. In addition, narcotic traffickers and drug dealers often use different telephones to deal with different "lines" of customers. For example, a drug dealer may use one telephone to contact customers who regularly purchase small pre-packaged quantities of narcotics and another telephone for customers who regularly purchase larger quantities, or may use different telephones to distribute different types of narcotics. Similarly, drug dealers whose business extends into multiple states also sometimes use one telephone for local customers and another telephone for out-of-state customers. Finally, notwithstanding the foregoing, I know that drug dealers may use two or more cellular telephones interchangeably for all their narcotics trafficking undertakings. This enables distributors to accommodate a high volume of narcotics trafficking calls. The use of two or more telephones interchangeably also enables distributors to immediately terminate service on one telephone without crippling their illegal business, if they believe the telephone is being targeted by law enforcement for installation of a court-authorized wiretap.

83.    Based on my training and experience, I also know that narcotics traffickers and individuals involved in the diversion of controlled substances use various features of and applications on their phones, such as calls, messenger, and text messaging, to contact each other and arrange drug transactions. Further, based on my training and experience, I know that these individuals often utilize phone applications such as Signal, WhatsApp, Telegram and others to exchange encrypted messages and calls with customers, sources of supply, and co-conspirators in an effort to preclude law enforcement from intercepting these communications. Narcotics traffickers also use their phones to store contact information for customers, suppliers, and other criminal associates. Narcotics traffickers access internet-based applications, such as Facebook or

Snapchat, in furtherance of their trafficking activities, and use their phones' GPS or location services to arrange meetings and find meeting locations to conduct narcotics transactions. In addition, based on my training and experience, I know that narcotics traffickers often have photographs or videos of themselves, contraband, diverted controlled substances, co-conspirators, and assets purchased with drug proceeds; these photographs and videos are frequently stored electronically on wireless telephones and other electronic devices. Lastly, based on my training and experience, I know that with the advent of online banking services, peer-to-peer money transfer services such as Venmo and CashApp, and digital wallet services such as Apple Pay and Google Pay, that narcotics traffickers use cellular phones to pay drug debts, transfer or request payments, or launder proceeds from their unlawful activities.

## VIII.  TECHNICAL TERMS

84.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates,

appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The

Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

85.     Based on my training, experience, and research, I know that TARGET DEVICES have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## IX.    ELECTRONIC STORAGE AND FORENSIC ANALYSIS

86.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

87.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

38

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

87.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device(s) consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

88.    *Manner of execution.* Because this warrant seeks only permission to examine a device(s) already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## X.   CONCLUSION

89.   I submit that this affidavit supports probable cause for the requested search warrants

authorizing the examination of the devices described in Attachment A to the search warrants to

seek the items described in Attachment B to the search warrants.

Matthew Bok
Task Force Officer
Drug Enforcement Administration

The truth of the foregoing affidavit has been attested to me by DEA Task Force Officer Matthew
Bok over the telephone on this 20th   day of November, 2024, at New Haven, Connecticut.

Date: 2024.11.20
12:35:06 -05'00'

HON. THOMAS O. FARRISH
UNITED STATES MAGISTRATE JUDGE

40

**ATTACHMENT A**
**(TARGET TELEPHONE 1)**

**DESCRIPTION OF THINGS TO BE SEARCHED**

1.    This warrant authorizes the search of the following electronic device:

    a.    The property to be searched is an Android smartphone in a red case, assigned number 860-776-7156, hereinafter the "**TARGET DEVICE**" or "**TARGET TELEPHONE 1**". The **TARGET DEVICE** is owned and utilized by Evelyn JIMENEZ-KOVALEV, and is currently stored at the DEA New Haven Office evidence vault.

2.    This warrant authorizes the forensic examination of the **TARGET DEVICE** for

the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

### **Particular Things to be Seized**

All records, information, photographs, images, videos, call logs, contacts, text messages, internet browsing history, and calendars, in any format, including any associated metadata, as well as geo-location information, that constitute evidence of a potential violations of Title 21, United States Code, Section 841 (Possession with the Intent to Distribute Controlled Substances); Title 21, United States Code, Section 846 (Conspiracy to Possess with the Intent to Distribute and to Distribute Controlled Substances); and Title 21, United States Code, Section 843 (Use of a Telephone to Facilitate a Narcotics Trafficking Felony) (the "Charged Offenses") for the time period of June, 2024 through November, 2024 including but not limited to the following:

1.  the telephone number, ESN number, IMEI number, other identifying number, serial number, and SIM card number of the TARGET DEVICES;
2.  the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the TARGET DEVICES;
3.  descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;
4.  any and all records, however created or stored, which tend to demonstrate ownership and use of the TARGET DEVICES, and identification bearing the name or photograph of any person, telephone books, address books, date books, calendars, personal files, and photographs of persons contained in the TARGET DEVICES;
5.  any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the TARGET DEVICES, such as passwords, sign-on codes, and program design;
6.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;
7.  saved searches, locations, and route history in the memory of the TARGET DEVICES;
8.  internet browsing history, to include, internet searches in the memory of the TARGET DEVICES; and
9.  images and videos in the memory of the TARGET DEVICES.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described TARGET DEVICES may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device/s.

It is further authorized that the officers executing this warrant may send the TARGET DEVICES to a commercial vendor outside of Connecticut to permit the analysis called for herein.

## ATTACHMENT A
## (TARGET TELEPHONE 2)

### DESCRIPTION OF THINGS TO BE SEARCHED

1.    This warrant authorizes the search of the following electronic device:

a.    The property to be searched is a blue iPhone smartphone with no case, with a background lock screen of a face with red eyes, suspected to be assigned call number (959-258-9523), hereinafter the "**TARGET DEVICE**" or "**TARGET TELEPHONE 2**". The **TARGET DEVICE** is owned and utilized by Angel BENITEZ, and is currently stored at the DEA New Haven Office evidence vault.

2.    This warrant authorizes the forensic examination of the **TARGET DEVICE** for

the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

**Particular Things to be Seized**

All records, information, photographs, images, videos, call logs, contacts, text messages, internet browsing history, and calendars, in any format, including any associated metadata, as well as geo-location information, that constitute evidence of a potential violations of Title 21, United States Code, Section 841 (Possession with the Intent to Distribute Controlled Substances); Title 21, United States Code, Section 846 (Conspiracy to Possess with the Intent to Distribute and to Distribute Controlled Substances); and Title 21, United States Code, Section 843 (Use of a Telephone to Facilitate a Narcotics Trafficking Felony) (the "Charged Offenses") for the time period of June, 2024 through November, 2024 including but not limited to the following:

1. the telephone number, ESN number, IMEI number, other identifying number, serial number, and SIM card number of the TARGET DEVICES;
2. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the TARGET DEVICES;
3. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;
4. any and all records, however created or stored, which tend to demonstrate ownership and use of the TARGET DEVICES, and identification bearing the name or photograph of any person, telephone books, address books, date books, calendars, personal files, and photographs of persons contained in the TARGET DEVICES;
5. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the TARGET DEVICES, such as passwords, sign-on codes, and program design;
6. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;
7. saved searches, locations, and route history in the memory of the TARGET DEVICES;
8. internet browsing history, to include, internet searches in the memory of the TARGET DEVICES; and
9. images and videos in the memory of the TARGET DEVICES.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described TARGET DEVICES may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device/s.

It is further authorized that the officers executing this warrant may send the TARGET DEVICES to a commercial vendor outside of Connecticut to permit the analysis called for herein.